(C. D. 1176)

## F. W. Woolworth Co. *v.* United States

United States Customs Court, Third Division

(Decided June 3, 1949)

*Sharretts & Hillis (Howard C. Carter* of counsel) for the plaintiff.
*David N. Edelstein,* Assistant Attorney General (*Dorothy C. Bennett* and *William J. Vitale,* special attorneys), for the defendant.

Before Cline, Ekwall, and Johnson, Judges

Johnson, Judge: This action involves the assessment of duty by the collector upon 469⅝ dozen ladies' linen handkerchiefs, invoiced as contained in cases 912 and 913 of a shipment consisting of four cases containing 3,700 dozen handkerchiefs from Belfast, Ireland. The plaintiff claims that none of the said handkerchiefs were imported into the United States.

The official papers in the case, which were admitted in evidence, disclose that case 913 was landed with a board broken and in bad order from the steamship "Ferncliff." A search of the pier resulted in finding 27 packages, each labeled "5 dozen Irish Linen Handkerchiefs (lady's)," which were identified as a part of case 913. The contents of said case were then reported by the discharging inspector as 775⅝ dozen. The invoice, however, specified that the case contained 1,000 dozen, 224⅝ dozen more than reported.

Relative to case 912, there was no report of shortage by the discharging inspector. The case was released upon presentation of a delivery permit to the importer's truckman. The papers disclose, however, that when unpacked at the importer's warehouse, 755 dozen were found rather than the 1,000 dozen appearing on the invoice.

At the trial of this case, three witnesses testified on behalf of the plaintiff and two for the Government. William McKenna, the truck driver who delivered the cases from the pier to the importer's warehouse, testified substantially as follows: Upon presentation of the delivery permit to the discharging inspector he received from the pier three of the four cases imported, to wit, cases 912, 913, and 915. Case 914 had been sent to the appraiser's stores for examination. At the pier, case 913 was in what was called the "crib" which, it was testified, is a portion of the pier, "a slatted section," where damaged merchandise is placed for protection of the importer as well as the steamship company and is under direct supervision of the customs. There are at these piers workers known as "public loaders" who help load cases on trucks. Before signing for case 913, the truck driver asked these public loaders to place cases 912 and 915 on his truck. Usually the loaders merely put cases on the tailboard of the truck to be set in place by the truck driver. In this instance, however, they moved the two cases to their proper place in the truck. In crossing the ferry from Hoboken, he stood alongside the truck at all times and no one had an opportunity to tamper with his cargo. While the truck was in motion from the time it left the pier until the cargo was delivered to the importer's warehouse, there was no opportunity afforded anyone to tamper with the cases. The truck driver personally removed the three cases in question from the truck to the warehouse. In so doing, he turned them end over end, thus discovering that the center board on the bottom of case 912 was loose. He immediately called the receiving clerk's attention to the loose board who caused the contents to be checked before he would sign for the delivery of the case. As a result of this check, it was discovered that 245 dozen ladies' handkerchiefs were missing. Immediately the truck driver returned to the pier to seek an adjustment. He discovered that there were about seven hundred other truck drivers there from various companies all complaining about similar conditions of cases they had delivered which had been imported upon the same vessel.

Robert Neil, receiving clerk for F. W. Woolworth Co., testified that he received case numbered 912, but on account of the loose board he had the contents examined before signing for it. In the examination he found 49 dozen packages, 5 dozen each, missing. The case was opened and the handkerchiefs counted in the presence of the truck

driver and the head of the department, and a receipt was given the driver for the quantity found in the case.

Mario Pellacani, manager of the import and export department of F. W. Woolworth Co., testified that out of the shipment two cases, 912 and 913, were damaged, and the missing contents were not received in any other shipment.

Chief Liquidator George E. Berge, testifying for the Government, stated that the entry was made on April 25, 1945, which was the date on which the delivery permit was issued, and that date also corresponds to the day upon which the duty was paid; and that the issuance of a delivery permit entitles the importer to take delivery of all of the importation *except* such as is sent to the public stores for examination of the appraiser.

Customs Inspector Edmund K. Reidy testified for the Government substantially as follows: When the steamship "Ferncliff" arrived in port, he was the discharging inspector and signed the inspector's report, listing the total landed quantity in case 913. He made out his report and signed his name on May 9, 1945, although the contents of the case were actually counted on April 30, 1945. Usually it is the steamship company that notifies the inspectors when a case is in bad order. There was nothing to establish that there was any case other than case 913 that was in bad order. The purpose of the tally sheet is to show the cargo released by the inspector to the importer's carrier, and the actual date of delivery shown is May 3, 1945. It is the practice to have someone constantly on duty at piers. Watchmen and customs officers are stationed at piers at all times and there also is a barricade at the shoreward end of piers.

The inspector admitted that the truck driver, William McKenna, had returned to the pier after discovering the shortage in case 912 and that he had conversed with him, at which time the truck driver attempted to have the case examined by the customs authorities, but that such request was denied.

On pages 31–32 of the record the following colloquy appears:

By Mr. Carter:

\* \* \* \* \* \* \*

X Q. ˙ Isn't it a fact that a great many cases from the same hold from which these cases of handkerchiefs were taken had been tampered with on this ship?

Mrs. Bennett: I object, your Honor. It is immaterial. \* \* \*

\* \* \* \* \* ˙ \* \*

Judge Johnson: It seems to me that might have some bearing on it as to whether shortages were prevalent at that particular place at that particular time. It can be shown whether there were shortages or cases tampered with the same day or about the same time.

Mrs. Bennett: May I have an exception?

A. There were quite a few.

Counsel for the importer contends that duty is assessable only upon merchandise imported into the United States, and that the merchandise not found in either of the two cases in question was not imported. Therefore, duty is not assessable thereon.

Counsel for the Government contends that the plaintiff has failed to establish that there was any shortage in case 912 at the time it was landed in the United States. It is further contended that as the delivery permit was issued 10 days before the shortage was discovered in case 912, such shortage should be inferred as occurring during the intervening period and not before landing. The allowance sought by the plaintiff in duties taken upon the merchandise found short by the discharging inspector in case 913 was not contested by the Government.

That the plaintiff should not be assessed with duty upon merchandise which has not actually been imported into the United States, there can be no question. In the case of *United States* v. *Browne Vintners Co., Inc.*, 34 C. C. P. A. 112, C. A. D. 351, the court held that the issue in shortage cases is not whether there was a compliance with the customs regulations but whether or not there was in fact a nonimportation of the goods, as claimed by the importer, and the burden of proof was upon the importer.

Reviewing the law as announced by the courts as to merchandise in the same status as that contained in case 913, it is clear that no duty is assessable upon the handkerchiefs missing from that case. The evidence is also clear, with reference to case 912, that it was taken directly from customs custody and was under the constant surveillance and personal observation of one of the witnesses until examined by the receiving clerk immediately upon receipt, and the contents checked with the invoice and such portion as is at issue herein found missing. Therefore, we are unable to come to any conclusion other than that the evidence presented establishes *prima facie*, at least, that at the time the case was unladen from the vessel the merchandise missing therefrom was short to the extent claimed by the importer.

In the case of *Meadows, Wye & Co.* v. *United States*, 12 Ct. Cust. Appls. 396, T. D. 40583, the discharging inspector found four large boxes of the imported goods in bad order, examined the contents, and listed the same, forwarding the list to the collector. All of the boxes in the shipment had remained on the pier longer than usual after unlading. Truckmen delivering the boxes established that they were not tampered with while in their care. Several witnesses testified that the cases on the pier were in bad order. Undisputed evidence also established that boxes, with the heads smashed in, were seen in the hold of the vessel. Some of the boxes were examined on the dock and the contents listed, while others were examined in the

importer's private warehouse. There, as here, the Government contended that the evidence failed to establish whether the missing merchandise was abstracted before or after being landed, and therefore must be presumed to have been imported. The court was of the opinion that when the discharging inspector undertakes to list the contents of a case, there is a strong presumption that the shortage existed at that time, stating:

> * * * Who can, on the evidence, reasonably doubt that whatever was missing from the four boxes examined by the inspectors was missing therefrom when the boxes were unladen? * * * As to those examined at the warehouse it is safe, at least, to say that the importers have made a prima facie case of shortage therein.
>
> Possibly, although the claim is not made in argument, a different view might be adopted as to box 1467 [examined at importer's warehouse], because the discharging inspectors do not appear to have observed it to be in bad condition. It was, however, part and parcel of the same importation, treated, handled, and its contents checked up in the same manner as the other boxes, and we think the importer has established prima facie, at least, the shortage as to that particular box.

In the case of *United States* v. *Lippmann, Spier & Hahn*, 11 Ct. Cust. Appls. 336, T. D. 39145, the controversy involved one out of nine cases sent to the appraiser's stores. The one case was found by the appraiser to be in bad order with merchandise missing. The inspector, who discharged the merchandise from the vessel, reported, however, that the landing thereof was effected in "apparent good order." Inasmuch as such a report was made, the Government contended that any loss must have occurred after importation and an allowance was not authorized. The court noted in its opinion that the case was constantly in customs custody until after the shortage was discovered and stated respecting same as follows:

> If, when unlading, a case were in very bad condition, it would doubtless attract the inspector's attention, otherwise it would naturally be reported as "in apparent good order." We are not persuaded that the condition of case 15488, assuming it to be as found by the appraiser, was such as to require us to presume that the inspector would observe or report it. It seems reasonable that he might well have discharged his duty by reporting it as in *apparent* good order.
>
> It is evident that in the unlading of merchandise from a vessel a careful and particular examination of each case would be impracticable.
>
> In other words, we attach no controlling importance to the report of the discharging inspector, so far as it relates to the package in question.
>
> Counsel on both sides agree that it is to be presumed that the customs officials have performed their duty in all respects, and we concur therewith. Applying such presumption to this case, it is clear that the facts do not require any conclusion that the goods found short were abstracted from the case after importation. All legal presumptions are satisfied, and no crime or negligence imputed to any customs officer by holding, as did in effect the Board of General Appraisers, that presumably the shortage existed prior to importation.

In *Raymond & Heller* v. *United States*, 66 Treas. Dec. 574, T. D. 47360, a question of shortage arose as to a shipment of 16 bales of

Persian rugs. Two of the bales were sent to the appraisers' stores and the remainder delivered to the importer. The importer claimed the rugs invoiced as included in bale 175 were not in fact contained therein, nor in any other bale of the shipment. Bale 175 was not one of the bales ordered for examination by the appraiser. However, it appeared that said bale came to the public stores for examination 6 months after the bales which were ordered to be sent there for examination, the collector having ordered it back to the public stores for re-examination. The court, commenting upon the case of *United States* v. *Lippmann*, etc., *supra*, stated:

\* \* \* In announcing that rule the court stated that the opinion of the appraiser was not important, but if it were, "it might just as well relate to robbery before the package crossed the customs line as afterwards." From this language of the court we deduce that it was its opinion that inasmuch as the case was in continuous customs custody any shortage discovered therein relates back to the time the merchandise crossed the customs line. Therefore, in order to establish shortage existing in an unexamined package, it is necessary for the importer who has complied with the regulations and has been denied relief by the collector to prove before this court that no one had an opportunity to tamper with the case containing the merchandise from the time it left customs custody until it was opened by the importer discovering the shortage.

As to goods remaining upon the wharf after the issuance of a delivery permit, the court in that case further stated:

\* \* \* It is natural to assume, upon the unlading of a vessel, that merchandise not sent to the appraiser's stores for examination remains upon the wharf in customs custody until a permit of delivery, issued to the importer upon payment of the estimated duties, is presented to the customs officials at the wharf, whereupon the merchandise is immediately removed from the custody of the customs to that of the importer. \* \* \*

\* \* \* \* \* \* \*

\* \* \* The provisions of the Tariff Act of 1930 in regard to the unlading of cargo, section 450, and of article 144 of the Customs Regulations of 1930, make it clear that merchandise unladen from importing vessels is in the custody of the customs officials and kept in a guarded portion of the wharf where unladen until released upon presentation of a permit of delivery except in such cases where the goods have been unladen for a period of 25 days, whereupon the collector orders that the goods be sent to the public stores or general-order warehouse and there stored at the expense of the importer. \* \* \* under the law and regulations imported merchandise is released from customs custody only upon presentation of a delivery permit, and it is presumed that customs officers discharge their duty according to law. \* \* \*

We are therefore of the opinion in this case that evidence to the effect that the bale of rugs in question was received from the customs officials is sufficient to establish that a permit of delivery was issued to the importer upon payment of the estimated duties; and that said permit was handed to the customs officials in exchange for bale 175 by the truck driver, whereupon said bale was taken from that part of the wharf designated for articles in customs custody and delivered in the same condition as received to the importer. As the importer discovered immediately upon receipt of the bale that there was a shortage, we hold that said shortage relates back to the time the goods crossed the customs line and judgment will be entered in favor of the plaintiff.

In the case of *Jabara & Bros.* v. *United States*, 68 Treas. Dec. 1161, Abstract 32721, the shipment consisted of embroidered lace articles contained in two cases, numbered 823 and 824. Case 824 was sent to the appraiser's stores for examination. Case 823 was delivered from the pier to the importer's place of business. The appraiser reported that there were three cloths and two dozen napkins and six sets of articles missing from the case examined and the collector allowed the shortage so reported. Case 823 was transported by truck from the pier to the importer's place of business by John Dini. In handling, Mr. Dini noticed the unusual occurrence of the contents of the case shifting. He also noticed that it was lighter than it should be. Upon drawing these facts to the attention of the importer, the case was opened at once and the contents checked, resulting in the discovery of a quantity of missing articles. The collector refused to make allowance. At the trial the witnesses of plaintiff traced the custody of the case from the time it was landed upon the pier until it reached the importer's place of business, and it was conclusively shown that the missing goods were not stolen after landing in the United States. The case was in apparent good order when received by the importer, but when it was emptied of its contents one end not covered by iron straps had one nail missing and there was an indication from the inspection of the case, which was admitted in evidence, that the nails at one end had been removed, thus enabling the end of the box to be pried out. The nails were driven back in the same holes from which they had been removed and seemed from the outside to be in their proper place, but, when viewed from the inside, three of them were found to be out of place in the end boards. An examination of the interior of the case convinced the court that the case had been tampered with. In holding that duty upon the missing merchandise should not have been assessed, the court stated:

In view of the fact that from the time the case was discharged from the vessel until it was opened at the importer's place of business, it was constantly under the observation of the witnesses who testified at the trial and under the observation of others who were proved to be on duty at the pier, and as it was established that nothing could have been stolen therefrom after importation, we are convinced that at the time the merchandise was unladen it was short, as claimed by the importer. We hold, therefore, that the shortage relates back to the time the goods crossed the customs line.

As to the Government's contention that the delivery permit having been issued 10 days before the shortage was discovered in case 912, the shortage should be inferred as occurring during the intervening period after landing, the case of *Raymond & Heller* v. *United States*, *supra*, fully controverts such inference. Under the law and regulations imported merchandise is released from customs custody only upon presentation of a delivery permit, not upon issuance thereof.

The evidence before the court establishes that cases 912 and 913

were fully protected by the customs authorities upon the pier after their discharge from the "Ferncliff." Case 913 not only was actually landed in such bad order that the damage was brought to the attention of the customs authorities but the discharging inspector undertook to list the articles still remaining in the case. Case 912 also was established to have been tampered with but not so noticeably that discovery was made thereof before the time of delivery to the importer. However, the uncontradicted testimony establishes that case 912 was fully protected from the time it was removed from the custody of the customs until delivery at the importer's warehouse, where the contents thereof were listed before delivery was accepted. Evidence produced by both the importer and Government witnesses shows that there were many complaints from importers relative to shortages in cases imported upon the vessel "Ferncliff." The court is of opinion that the evidence is uncontradicted and reasonably establishes that the shortages occurred before landing. In view of such evidence and the foregoing cited cases, judgment will be entered in favor of the importer, directing the collector to reliquidate the entry and make refund of all duties taken upon the contents missing from cases 912 and 913, as claimed.